FILED
2010 Mar-31  AM 11:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ALABAMA
### JASPER DIVISION

| | | |
|---|---|---|
| **TERRY W. FLIPPO,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **vs.** | } | **CASE NO. 6:04-cv-2770-SLB** |
| | } | |
| **MICHAEL J. ASTRUE,**[1] | } | |
| **Commissioner, Social Security** | } | |
| **Administration,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

This case is currently before the court on plaintiff Terry W. Flippo's (the "Plaintiff")

appeal from the decision of the Commissioner of Social Security (the "Commissioner"),

denying his application (the "Application") for a period of disability, disability insurance

benefits, and Supplemental Security Income ("SSI").  (Doc. 1.)[2]  Also before the court is

Plaintiff's Motion to Remand or Render & Remand.  (Doc. 11.)  Upon consideration of the

record, the submissions of the parties, and the relevant law, the court is of the opinion that

Plaintiff's Motion to Remand or Render & Remand is due to be denied and the

Commissioner's decision is due to be affirmed.

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue is substituted for Jo Anne B. Barnhart as the defendant in this suit by operation of law.

[2] Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

## I.  PROCEDURAL HISTORY

Plaintiff initially filed his Application on October 17, 2002, alleging disability since January 2, 2002 due to chronic lower back pain and problems walking.[3]  (Doc. 10 at 1-2; Doc. 14 at 1; R at 95-98, 112.)[4]  On July 6, 2004, the first administrative law judge assigned to the case (the "First ALJ") denied Plaintiff's Application.  (R at 146-53.)  The Appeals Council, on August 27, 2004, denied Plaintiff's request for review, and the First ALJ's decision consequently became the final decision of the Commissioner.  (*Id.* at 64-66.)

Next, on September 21, 2004, Plaintiff filed suit in the United States District Court for the Northern District of Alabama seeking further review of the Commissioner's decision.  (Doc. 1.)  On October 25, 2005, on motion by the Commissioner, this court remanded the case instructing the Appeals Council to remand the case to an administrative law judge to conduct a *de novo* hearing, and to issue a new decision.  (Doc. 6.)

The second administrative law judge assigned to the case (the "Second ALJ") conducted a *de novo* hearing by telephone on December 19, 2007.[5]  (R. at 10.)  Following the hearing, on February 29, 2008, the Second ALJ issued a decision denying Plaintiff's

---

[3] In his Application, Plaintiff actually stated he became disabled on December 5, 2001.  (R. at 96.)  But, as the Commissioner correctly points out, (Doc. 14 at 1 n.2), in his Appellant's Brief, Plaintiff asserts that "his disabilities started on January 2, 2002," (Doc. 10 at 1).  Plaintiff likewise alleges January 2, 2002 to be the pertinent date on an Affidavit of Work Activity.  (R. at 100.)

[4] The reference format, ["R. at ___"], refers to page numbers as they appear in the certified copy of the transcript of the administrative record, filed with the court by the Commissioner in accordance with 42 U.S.C. § 405(g).

[5] The ALJ conducted the hearing by telephone because Plaintiff was then imprisoned at Kilby Correctional Facility.  (*See* R. at 10, 34, 38, 168.)

Application.  (*Id.* at 10-18.)  Thereafter, on January 9, 2009, the Appeals Council again denied Plaintiff's request for review, making the Second ALJ's decision the final decision of the Commissioner.  (*Id.* at 5-6.)  As a result, on March 6, 2009, this court reopened Plaintiff's appeal and issued a Notice to Parties, setting out a briefing schedule therein. (Doc. 8.)  In accordance with that schedule, Plaintiff filed his Appellant's Brief on April 24, 2009.  (Doc. 10.)  Plaintiff also filed his Motion to Remand or Render & Remand the same day.  (Doc. 11.)  In response, on June 11, 2009, the Commissioner filed his Response to Plaintiff's Motion to Remand or Render and Remand, (Doc. 13), as well as a Memorandum in Support of the Commissioner's Decision, (Doc. 14).

## II.  STANDARD OF REVIEW

In reviewing claims brought under the Social Security Act, this court's role is a narrow one, limited to determining whether the Commissioner's decision is supported by substantial evidence and whether the proper legal standards were applied.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005); *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983).  Although the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner, *see Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983), this limited scope of review does not render affirmance automatic: "'despite [this] deferential standard for the review of claims . . . [the] Court must scrutinize [the] record in its entirety

3

to determine the reasonableness of the decision reached,'" *Lamb*, 847 F.2d at 701 (citation omitted).   But, the credibility of witnesses and the resolution of conflicting evidence are determined by the Commissioner as the trier of facts.   *Bloodsworth*, 703 F.2d at 1242.

The burden is on the claimant to prove disability.   *Kirkland v. Weinberger*, 480 F.2d 46, 48 (5th Cir.), *cert denied*, 414 U.S. 913 (1973).   And, this "burden is a heavy one, so stringent that it has been described as bordering on the unrealistic."   *Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981) (citations omitted).   Even if the evidence preponderates against the Commissioner's decision, the court must affirm if the decision is supported by substantial evidence.   *Bloodsworth*, 703 F.2d at 1239.   Substantial evidence is defined as more than a scintilla, but less than a preponderance.   *See id.*   It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion.   *See id.*

## III.  FACTUAL SUMMARY

Plaintiff was born on September 17, 1955, and has a ninth grade education.  (R. at 36-37.)  At the December 19, 2007 hearing, he initially claimed that he was unable to do simple reading, writing, and math, but later clarified that while he can write, he has trouble spelling. (*Id.* at 37.)  Plaintiff further acknowledged that he can count change while shopping and that, during the periods of his past employment, he handled his own bills.  (*Id.* at 38.)

Regarding his past employment, Plaintiff has worked primarily in construction as a trailer builder, saw operator, telephone cable installer, forklift operator, rafter builder, roofer,

and metal worker.  (*Id.* at 113.)  He has also worked as a mechanic.  (*Id.* at 40.)  Plaintiff has been unemployed since January 2, 2002.  (*See id.* at 41, 100, 112.)  At the December 19, 2007 hearing, Plaintiff testified that he has trouble sitting, walking, bending over, and straightening up.  (*Id.* at 41, 44.)  He stated that most of the time he has to lay halfway down. (*Id.* at 41.)  Further, Plaintiff maintained that he cannot do any lifting, light or heavy, due to the severity of the pain.  (*Id.* at 41-42.)  He has rated the pain a "10/10."  (*Id.* at 139.)

Prior to filing his Application, Plaintiff noted that due to financial constraints and lack of insurance, he had not seen any doctors except during job interviews.  (*Id.* at 119.)  After filing his Application, on January 21, 2003, Plaintiff visited Dr. Samuel D. Steele, a consultative examiner designated by Disability Determination Services ("DDS"). (*Id.* at 134-37.)  Dr. Steele assessed Plaintiff as suffering from "chronic low back pain syndrome likely related to degenerative arthritis of the lumbar spine," and recommended "moderate and ongoing conservative medical management."  (*Id.* at 135.)   Following Dr. Steele's examination, Plaintiff next requested treatment on June 22, 2003, from the Southern Rural Health Care Consortium, while incarcerated at Franklin County Jail.  (*Id.* at 181-82.) However, the record does not indicate whether Plaintiff actually received treatment at that time.  (*See id.*)  Nevertheless, on referral by Vocational Rehabilitation and Employment Services ("Vocational Rehab"), Plaintiff did receive treatment on multiple occasions from June 2003 to August 2003 from Drs. Erich W. Wouters and Mark A. Prevost, physicians at

the Southern Orthopedic & Sports Medicine Association.[6]  (*See id.* at 134-42.)  Dr. Prevost

diagnosed Plaintiff with "Lumbar Spondylosis and Stenosis," prescribed two lumbar epidural

steroid injections, and recommended a six week follow-up examination.  (*Id.* at 138.)  The

record does not include any evidence of a follow-up examination.[7]  (*See id.* at 138-42.)

    After the last examination by Dr. Prevost, a gap exists in Plaintiff's medical records,

evidencing that Plaintiff did not receive further treatment until February 28, 2006,[8] when he,

following a subsequent incarceration, again sought treatment from the Southern Rural Health

Care Consortium.  (*See id.* at 44, 176-80.)  Thereafter, the record indicates that Plaintiff

sought and/or received additional treatment in May 2006, while imprisoned at Kilby and

Ventress Correctional Facilities.[9]  (*See generally id.* at 183-211.)

    During the December 19, 2007 hearing, the Second ALJ, after questioning Plaintiff

with respect to his right to counsel,[10] educational background, past employment, and medical

---

[6] The treatment notes from the Southern Orthopedic & Sports Medicine Association reveal that Plaintiff also received treatment from Dr. Wouters on July 31, 1997.  (*See* R. at 141.)

[7] Apparently, Plaintiff also did not receive the lumbar epidural steroid injections.  (*See* R. at 138.)  Instead, it seems that Vocational Rehab went through proration and thereafter lacked the necessary funds to approve the injections.  (*See id.* at 44, 138.)

[8] Plaintiff's testimony is consistent with this determination.  (*See* R. at 44.)

[9] The record also indicates that Plaintiff sought and/or received medical treatment on multiple occasions from July 2006 through August 2006; however, these records pertain to either dental problems or a skin infection, and are therefore not pertinent for purposes of this appeal.  (*See* R. at 194-95, 204-08.)

[10] Specifically, the Second ALJ asked whether Plaintiff was ready to proceed without counsel. (R. at 34.)  Plaintiff stated "[y]es, sir."  (*Id.*)  The Second ALJ further inquired, "[a]nybody twist your arm or make you proceed without an attorney?"  (*Id.*)  Plaintiff replied "[n]o, sir."  (*Id.*)

history,[11] (*see id.* at 34-44), asked Plaintiff to discuss any current treatment for his lower back, (*id.* at 43).  Plaintiff testified that he was taking several pain medications, and that while he had not had any problems with the medications, they only provided "some" relief. (*Id.*)  After further questioning, Plaintiff added that prior to his incarceration, he neither exercised nor took prescription medication for the pain.  (*Id.* at 44.)  That said, Plaintiff clarified that he had sought treatment, but funding had later become unavailable.  (*See id.*)

The Second ALJ then inquired about Plaintiff's history of alcohol consumption, pointing out to Plaintiff that if alcohol materially contributes to his disability, he would not be eligible for benefits.  (*Id.* at 45.)  The Second ALJ also informed Plaintiff that his medical records showed that he "w[as] pretty much daily involved with alcohol [for] over 30 years." (*Id.*)  Plaintiff affirmed his history with alcohol, but maintained that he limited his drinking to the weekends; he stated that he typically drank "[a]bout a half case."  (*Id.*)

Next, after a brief discussion with Plaintiff concerning his prior legal problems, which included two felony convictions for driving under the influence, and a separate felony conviction for receiving stolen property, (*see id.* at 38-39, 45), the Second ALJ called to testify Mr. Eric Anderson, Jr., the vocational expert assigned to Plaintiff's case, (*see id.* at 46).  Mr. Anderson confirmed that "[Plaintiff's] past work would be classified in the medium

---

[11] The Second ALJ also asked Plaintiff about his involvement in work programs while incarcerated at Kilby and Ventress Correctional Facilities.  (R. at 42.)  Plaintiff acknowledged that he worked on the paint crew while at Ventress, but denied that he did any painting.  (*Id.*)  When the Second ALJ further inquired about a document that seemingly cleared Plaintiff for kitchen duty, Plaintiff responded that he worked only on the paint crew.  (*Id.*)

to heavy category of labor from an unskilled to a skilled level." (*Id.* at 47.)  Then, after pointing out to Mr. Anderson that the First ALJ had limited Plaintiff to lighter work, the Second ALJ asked whether, assuming he likewise limited Plaintiff to lighter work, if Plaintiff's past work was feasible.  (*Id.*)  Mr. Anderson testified that it was not.  (*Id.*)  Following the response, and with Plaintiff having no further questions or comments, the Second ALJ concluded the hearing, informing Plaintiff that he would provide a written decision within thirty to sixty days.  (*Id.*)

## IV.  DISCUSSION

### A.    FIVE-STEP EVALUATION

The *Code of Federal Regulations* requires that the Commissioner follow a five-step sequential evaluation to determine whether a claimant is eligible for disability benefits or SSI.[12]  20 C.F.R. §§ 404.1520, 416.920; *Bowen v. City of New York*, 476 U.S. 467, 470

---

[12] "Disability" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determination physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. §§ 423(d)(1)(A), 1382a(3)(A).  Further:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B).

8

(1986).  The specific steps in the process are as follows:

1.      The Commissioner must first determine whether the claimant satisfies his burden of coming forward with proof that he is not engaged in "substantial gainful activity." *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).   If the claimant is working, the Commissioner will find that the claimant is not disabled, regardless of the claimant's medical condition, age, education, and work experience.  20 C.F.R. §§ 404.1520(b), 416.920(b).

2.      If the claimant is not engaged in "substantial gainful activity," the Commissioner must determine whether the claimant suffers from a medically severe impairment or combination of impairments.  *Id.* §§ 404.1520(c), 416.920(c).[13]   For this inquiry, the claimant bears the burden of showing that he has a medically severe impairment or combination of impairments.  *Yuckert*, 482 U.S. at 146 n.5; *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).

3.      If the claimant has a severe impairment, the Commissioner must determine whether the claimant's impairment meets the durational requirement and is equivalent to any one of the number of listed requirements that the Commissioner acknowledges are so severe as to prevent the claimant from performing substantial gainful activity.  *See* 20 C.F.R. §§

---

[13] The regulations provide:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled.  We will not consider your age, education, and work experience.

20 C.F.R. §§ 404.1520(c), 416.920(c).

404.1520(d), 404, Subpt. P, App. 1.  If the claimant's impairment meets or equals an impairment listed in the regulations, the Commissioner must find the claimant disabled, regardless of the claimant's age, education, and work experience.  *Id.* §§ 404.1520(d), 416.920(d).

4.    If the impairment does not meet one of the listed impairments, and therefore is not conclusively presumed to be disabling, the Commissioner must review the claimant's residual functional capacity ("RFC"), along with the physical and mental demands of the claimant's prior work experience, to determine whether the claimant is capable of performing work that he has performed in the past.  If the claimant is still capable of performing the kind of work that he has done in the past, the Commissioner will not find the claimant disabled. *Id.* §§ 404.1520(e), 416.920(e).  As with elements one through three, the claimant again bears the burden of establishing that the impairments prevents him from performing his past work. *Yuckert*, 482 U.S. at 146 n.5.

5.    Finally, if the claimant cannot do the kind of work that he performed in the past, the Commissioner must review the claimant's RFC, along with his age, education, and work experience, to determine whether the claimant is capable of performing any other work that exists in the national economy.[14]  If the claimant is not capable of performing any other jobs in the economy, then the Commissioner must find that the claimant is disabled.  20

---

[14] "'[W]ork which exists in the national economy'" is defined as "work which exists in significant numbers either in the region where such individual lives or in several regions of the country.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

C.F.R. §§ 404.1520(f), 416.920(f).   Unlike elements one through four, however, the Commissioner bears the burden of establishing that there are other jobs in the national economy that the claimant is capable of performing.   *Yuckert*, 482 U.S. at 146 n.5; *Chester*, 792 F.2d at 131.

Applying the first step of the sequential evaluation, the Second ALJ found that Plaintiff "has not engaged in substantial gainful activity since January 2, 2002, the alleged onset date."  (R. at 14.)  With respect to the second step, the Second ALJ determined that Plaintiff suffers from two severe impairments: lumbar spondylosis and degenerative joint disease.  (*Id.*)

As to the third step, the Second ALJ considered Plaintiff's impairments and found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 . . . including any Listing Section relevant to musculoskeletal impairments."[15]  (*Id.*)

---

[15] To be sure, Dr. Prevost did diagnose Plaintiff as suffering from "stenosis."  (R. at 138.) However, while "Lumbar spinal stenosis" is specifically listed in the musculoskeletal impairment section of the regulations, the impairment requires "pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in an inability to ambulate effectively as defined in 1.00B2b."  *See* 20 C.F.R. § 404, Subpt. P, App. 1, Part A § 1.04C.  Pseudoclaudication "is manifested as pain and weakness, and may impair ambulation."  *Id.* § 404, Subpt. P, App. 1, Part A § 1.00K3.  And, an "[i]nability to ambulate effectively means an extreme limitation of the ability to walk: *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." *Id.* § 404, Subpt. P, App. 1, Part A § 1.00B2b(1).  Construing the sections together, it is clear that a diagnosis of "stenosis," without more, is insufficient to qualify as "an impairment[] that meets or equals one of [the] listings in appendix 1 of . . . subpart [P] and meets the duration requirement." *See id.* §§ 404.1520(a)(4)(iii), (d).

Specifically, the Second ALJ stated that "[Plaintiff's] medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [RFC] assessment." (*Id.*) The Second ALJ also pointed out that, along with the RFC assessment, the "paucity of medical evidence . . . for complaints surrounding [Plaintiff's] alleged impairments" was likewise inconsistent with Plaintiff's subjective allegations. (*Id.* at 16.)

As to the fourth step, the Second ALJ found that, given Plaintiff's RFC, Plaintiff could not perform his past relevant work:

> [Plaintiff] has relevant work as a laborer, roofer, saw operator, trailer construction worker, metal worker, and fork lift operator. The vocational expert described [Plaintiff's] past work as ranging from medium to heavy in exertion and from unskilled work to work at the skilled level. The vocational expert also testified that if the hypothetical individual were limited to light work, his past work would not be feasible. The undersigned finds that [Plaintiff] is unable to perform any of his past relevant work, as [Plaintiff] possesses a[n RFC] to perform no more than light work activity and all of his prior work activity requires medium or greater exertion.

(*Id.* at 17.)

Lastly, regarding the final step, after determining that Plaintiff could no longer perform his past relevant work, but "ha[d] the [RFC] to perform the full range of light work," the Second ALJ determined that "there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform." (*Id.* at 14, 17.) As a result of that determination, the Second ALJ concluded that "a finding of 'not disabled' [was] directed by Medical-Vocational rule 202.17," and therefore denied Plaintiff's Application. (*Id.* at 17.)

12

Plaintiff seems to challenge the Second ALJ's decision, as adopted by the Commissioner, on four grounds: (1) that the Second ALJ did not properly consider and/or accord "substantial and considerable weight" to the medical evidence, (2) that the Second ALJ erred in finding that Plaintiff did not meet the "pain standard," (3) that the Second ALJ "had no reason to doubt [Plaintiff's] "functional illiteracy," and (4) that the December 19, 2007 hearing constituted a *pro se* proceeding, and that the Second ALJ failed to develop a "full and fair record." (*See* Doc. 10 at 17-20.)  The court will address each argument in turn.

## B.   MEDICAL EVIDENCE

Plaintiff first argues that the Second ALJ failed to accord "substantial and considerable weight" to the medical opinions of his physicians.  (Doc. 10 at 17-19.) Specifically, Plaintiff insists that the Second ALJ "tr[ied] to get around" the opinions of Dr. Prevost, a treating physician, as well as Dr. Steele, the consultative examiner, and maintains their opinions are inconsistent with the Second ALJ's findings.  (*Id.* at 19.)  Plaintiff also argues that "[t]he fact assertion that there may be a paper saying that [Plaintiff] was assigned to kitchen duties [while incarcerated at Ventress Correctional Facility] should be an insufficient reason to contradict the treating physician's testimony."  (*Id.*)  As a result, Plaintiff contends that the ALJ "failed to properly refute" the treating physicians' opinions, and for that reason their opinions "as a matter of law . . . must be accepted as true."  (*Id.*)

"In assessing the medical evidence in [a] case, the ALJ [is] required to state with

13

particularity the weight he gave the different medical opinions and the reasons therefore."
*MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).  A treating physician's opinion
is entitled to substantial weight in the Commissioner's determination of disability.  *See Lamb
v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988).  However, an ALJ may reject or discount a
treating physician's opinion if the record evidence supports such a finding.  *See Lucas v.
Sullivan*, 918 F.2d 1567, 1574 (11th Cir. 1990).  *See also Johns v. Bowen*, 821 F.2d 551, 555
(11th Cir. 1987) (stating that an ALJ may disregard a treating physician's opinion when the
opinion is unsupported by objective medical evidence or is merely conclusory).

By contrast, if an ALJ or other designated factfinder ignores a treating physician's
testimony, or otherwise fails to properly refute it with objective evidence when discrediting
it, the reviewing board must accept the testimony as true.  *See Elam v. R.R. Ret. Bd.*, 921 F.2d
1210, 1216 (11th Cir. 1991); *MacGregor*, 786 F.2d at 1053.  In *Elam v. Railroad Retirement
Board*, a case that Plaintiff significantly relies on, a railroad brakeman suffered an injury to
his lower back when the train he was riding suddenly stopped, throwing the brakeman to the
floor.  *Elam*, 921 F.2d at 1212.  Complaining of severe pain following the injury, the
brakeman visited hospital emergency rooms on multiple occasions, and was at one point
hospitalized for one week.  *Id.*   The brakeman's treating physician opined that the
brakeman's back condition "would prevent [him] from returning to his former job and that
the swelling in his right leg would prevent him from doing even sedentary work."  *Id.*
Similarly, a second physician, designated by the Railroad Retirement Board to examine the

brakeman, likewise concluded that the brakeman "could not do work that required him to sit or stand for prolonged periods." *Id.* at 1213.  Both physicians found the brakeman to be "totally disabled." *Id.*  On the other hand, other physicians who had examined the brakeman found that he could perform light or sedentary work. *See id.* at 1212-13.  For that reason, the appeals referee rejected the treating physician and Board designated physician's opinions in favor of the opinions of the other examining physicians, and consequently denied the brakeman's application for disability benefits. *Id.* at 1213.  The Board affirmed. *Id.*  On appeal, the United States Court of Appeals for the Eleventh Circuit pointed out that neither the appeals referee nor the Board had offered "good reason" for discounting the opinion of the brakeman's treating physician, and that the appeals referee's reliance on the opinions of the other examining physicians, without objective evidence in support, was insufficient. *See id.* at 1216.  Therefore, the Eleventh Circuit reversed the Board's decision, holding that, on remand, "the Board must . . . accept as true the conclusion of the treating physician, corroborated by the conclusion of [the Board designated physician], that [the brakeman] suffers from disabling pain." *Id.* at 1217 (citing *MacGregor*, 786 F.2d at 1053).

In the instant case, unlike the appeals referee in *Elam*, and despite Plaintiff's conclusory allegation to the contrary, the Second ALJ did not attempt to "get around" the medical opinions of Dr. Prevost and Dr. Steele. (*See* Doc. 10 at 19.)  Instead, a comparison of the Second ALJ's findings with Dr. Prevost and Dr. Steele's treatment notes demonstrates that the Second ALJ's findings are consistent with their opinions. (*See* R. at 12-18, 134-39.)

Indeed, on January 21, 2003, Dr. Steele found that Plaintiff has "a normal range of movement in all joints [of the musculoskeletal system] with no obvious swelling, deformities, or stiffness except in the lower lumbar spine.  Here, there is pain on palpation and stiffness throughout the range of movement but no reduction in the range of movement."  (R. at 135.)  Dr. Steele assessed Plaintiff as suffering from "chronic low back pain syndrome likely related to degenerative arthritis of the lumbar spine."  (*Id.*)  He recommended "more intensive medical management with initial medical therapy including physical therapy with a view for vocational rehabilitation and work assessment."  (*Id.*)  Still, he opined that Plaintiff's "functional impairment is moderate," and, as a result, recommended "ongoing conservative medical management."  (*Id.* at 136.)

Similarly, Dr. Prevost, on June 18, 2003, initially found "some decrease [Range of Motion] of the lumbar spine with pain at the extremes of motion."  (*Id.* at 139.)  He noted a "motor strength" of "5/5 to bilateral lower extremities" with a "subjectively decreased [sensation] on the right in what appears to be an L5 distribution."  (*Id.*)  He initially diagnosed Plaintiff with "Lumbar Spondylosis," "Disc Collapse at L5-S1," and "Possible Stenosis."  (*Id.*)  He recommended "an MRI scan of [Plaintiff's] lumbar spine," and, "[i]n the meantime . . . g[ave] him a prescription for ULTRACET AND SKELAXIN."  (*Id.*)  Later, on August 1, 2003, Dr. Prevost concluded that Plaintiff's "MRI basically showed pronounced disc deterioration at L5-S1," and also showed "a central to slightly eccentric to the right disc herniation which is fairly large which has a mass effect on the right S1 nerve

root." (*Id.* at 138.)  He diagnosed Plaintiff with "Lumbar Spondylosis and Stenosis."  (*Id.*)

But, as to treatment, Dr. Prevost decided "to set [Plaintiff] up with 2 lumbar epidural steroid

injections," and to "see [Plaintiff] back in 6 weeks for [a follow-up]."[16]  (*Id.* at 138-39.)

Relying on, *inter alia*, Dr. Prevost and Dr. Steele's evaluations,[17] and after

transcribing their assessments in the record, the Second ALJ determined that Plaintiff suffers

from "lumbar spondylosis and degenerative joint disease," and categorized the impairments

as "severe."  (*Id.* at 14.)  However, the Second ALJ noted that "no credible treating or

consultative physician has opined that [Plaintiff] was disabled because of any condition or

any symptoms."  (*Id.* at 15-16.)  He further found "no objective documentation that

[Plaintiff's] performance of daily activities has been substantially impaired due to his

diagnosed conditions."  (*Id.* at 16.)  The Second ALJ also pointed out that Plaintiff "has not

taken medications for any alleged complaint or symptom on a regular basis."  (*Id.*)  For these

reasons, the Second ALJ determined that because Plaintiff's "statements about the intensity,

persistence, or functionally limiting effects of pain or other symptoms [were] not

substantiated by objective medical evidence," he must "make a finding on the credibility of

---

[16] As aforementioned, *see supra* note 7, Plaintiff did not receive the lumbar epidural steroid injections because Vocational Rehab had insufficient funds following proration, (*see* R. at 44, 138).

[17] The Second ALJ also considered treatment notations from the Southern Rural Health Care Consortium and Ventress Correctional Facility.  (*See* R. at 13, 15-16.)  However, the Second ALJ found these notations to be consistent with the medical opinions of Dr. Prevost and Dr. Steele, and Plaintiff has not argued to the contrary.  (*See id.* at 15-16; *see generally* Doc. 10.)

[Plaintiff's] statements based on a consideration of the entire case record."[18]   (*Id.* at 14.)

The Second ALJ is correct that neither Dr. Prevost, Dr. Steele, nor any other physician determined that Plaintiff is disabled.  (*See, e.g.*, *id.* at 134-42.)  The Second ALJ is also correct that neither Dr. Prevost, Dr. Steele, nor any other physician found that Plaintiff's functional impairment was anything more than "moderate."  (*See, e.g.*, *id.* at 136.)  As the Commissioner correctly points out, "the record indicates that no physician assigned Plaintiff any functional limitations." (Doc. 14 at 11.)  Although both Dr. Prevost and Dr. Steele recommended treatment, neither physician, nor any other physician, recommended anything more extensive than "conservative" treatment.[19]   (*See, e.g.*, R. at 136.)  Dr. Prevost did prescribe medication for Plaintiff's pain on June 18, 2003, but the Commissioner is again correct that "there is no indication whether Plaintiff filled the prescriptions, and, on August 1, 2003, when Plaintiff returned for a follow-up, Dr. Prevost did not refill the prescriptions."[20]   (Doc. 14 at 12.)  Instead, Dr. Prevost merely prescribed two steroid

---

[18] The court will review the Second ALJ's findings with regard to the credibility of Plaintiff's statements in its discussion as to whether the Second ALJ erred in finding that Plaintiff did not meet the "pain standard."  *See infra* Part IV.C.

[19] Indeed, although not specifically cited by the Second ALJ, Dr. Wouters, who again works with Dr. Prevost, noted after examining Plaintiff on June 9, 2003 that, at that time, he "[c]ertainly [did] not see anything that [he] would recommend surgical intervention on." (R. at 140.) And, while Plaintiff alleges doctors had suggested surgery, medical records do not support his statement.

[20] In fact, as the court will discuss further in considering whether the Second ALJ erred in finding that Plaintiff did not meet the "pain standard," there is no objective evidence that Plaintiff took any prescribed medication for pain from January 2, 2002, the date he alleged disability, until May 2006, when incarcerated.  (*See* R. at 134-42, 176-211; Doc. 12 at 11-12.)  Plaintiff's own testimony at the December 19, 2007 hearing is consistent with this determination.  (*See* R. at 44.)

injunctions and recommended a follow-up appointment six weeks later.  (*Id.* at 138.)[21]

Simply put, the court finds that the Second ALJ did not ignore or otherwise refute the

medical opinions of Dr. Prevost and Dr. Steele, and indeed applied the proper legal

standards.[22]   *See* Notice of Social Security Ruling, 68 Fed. Reg. 59971-01 (Oct. 20, 2003)

("[W]henever the individual's statements about the intensity, persistence, or functionally

limiting effects of pain or other symptoms are not substantiated by objective medical

evidence, the adjudicator must make a finding on the credibility of the individual's

statements based on a consideration of the entire case record."); *see also* 20 C.F.R. §

402.35(b)(1) ("Social Security Rulings . . . are binding on all components of the Social

Security Administration.").  Plaintiff's initial argument is therefore unavailing.


## C.    PAIN STANDARD

For his second ground, Plaintiff argues that the Second ALJ erred in finding that

Plaintiff failed to meet the "pain standard."  (*See* Doc. 10 at 17-18.)  The "pain standard," as

set out by the Eleventh Circuit, represents a three-part test for "establish[ing] a disability

based on testimony of pain and other symptoms."  *Wilson v. Barnhart*, 284 F.3d 1219, 1225

---

[21] It is relevant to point out that, in his Appellant's Brief, Plaintiff cites multiple times that Dr. James S. Shirley, in July and August 2006, prescribed Plaintiff several medications for pain. (Doc. 10 at 11, 15.)  However, Dr. Shirley is a dentist, and treated Plaintiff for a tooth extraction, not for lower back problems.  (R. at 194-95.)

[22] Accordingly, Plaintiff's argument that the Second ALJ improperly relied on "a paper saying that [Plaintiff] was assigned to kitchen duties . . . to contradict the treating physician's testimony," is without merit.  (*See* Doc. 10 at 19.)

(11th Cir. 2002). "[T]he claimant must satisfy two parts of [the] three-part test [by] showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." *Id.* (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). And, although the ALJ may discredit subjective testimony, "he must articulate explicit and adequate reasons for doing so." *Id.* (citing *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987). "Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true." *Id.* (citing *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

Noncompliance with prescribed medical treatment and inconsistencies regarding a claimant's subjective testimony are both valid reasons for discrediting the claimant's testimony. *See Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003); *Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988). In *Ellison v. Barnhart*, an automobile detailer alleged that his seizure condition rendered him disabled, and therefore applied for SSI. *Id.* at 1274. At a hearing before an ALJ, the detailer gave testimony regarding his condition, which was supported by the opinion of an examining physician. *Id.* Nevertheless, the ALJ found the detailer's testimony, as well as the physician's opinion, to be inconsistent with other record evidence, including medical evidence. *Id.* at 1274, 76. Particularly, the ALJ noted that the detailer had not complied with prescribed medical treatment by failing to take his medication regularly, and also that the detailer had continued to consume alcohol despite

medical evidence linking the detailer's past seizures to alcohol consumption. *See id.* at 1275-76. The ALJ further determined that the detailer's testimony was inconsistent with his RFC, especially because the detailer had worked despite his impairment. *Id.* As a result, the ALJ denied the detailer's application, and the detailer appealed. *Id.* at 1274-75.

On appeal, the Eleventh Circuit reiterated that "'refusal to follow prescribed medical treatment without a good reason will preclude a finding of disability,'" and that "'poverty excuses noncompliance.'" *Id.* at 1275 (quoting *Dawkins*, 848 F.2d at 1213). The court then addressed its prior decision in *Dawkins v. Bowen*, in which it had reversed an ALJ's decision because the ALJ had relied exclusively on a claimant's noncompliance with medical treatment in denying the claimant's application, but had failed to consider the claimant's inability to afford treatment. *See id.* Nevertheless, the Eleventh Circuit distinguished *Dawkins*, stating that, in denying the detailer's application, the ALJ had relied on multiple factors aside from the detailer's failure to adhere to prescribed medical treatment. *Id.* Notably, however, the Eleventh Circuit again cited, *inter alia*, the detailer's noncompliance with prescribed medical treatment in holding that substantial evidence supported the ALJ's decision, despite no apparent reconciliation between the noncompliance and the detailer's argument that he was financially unable to afford treatment. *See id.* at 1275-76.

In the instant case, as in *Ellison*, the Second ALJ indeed cited Plaintiff's failure to take pain medication on a regular basis in discrediting Plaintiff's subjective testimony. (R. at 16.) The Second ALJ is correct, as noted above, that despite being prescribed Ultracet and

21

Skelaxin by Dr. Prevost on June 18, 2003, Plaintiff did not fill the prescriptions. (*See id.* at 16, 44, 139.) In fact, all of Plaintiff's medical records dated prior to his incarceration in 2006 indicate that Plaintiff was not taking any prescribed medication. (*See id.* at 134-42.) And, although Plaintiff testified to his lack of financial means, as pointed out by the First ALJ, Plaintiff has also "reported smoking 1 or 2 packs of cigarettes a day . . . and can apparently afford to buy them." (*See id.* at 42-44, 150.) What's more, though not specifically addressed by the Second ALJ, it remains that when initially examining Plaintiff, Dr. Wouters explained to Plaintiff that "the #1 [thing] that [Plaintiff s]hould do as far as his back pain [is] to quit smoking." (*Id.* at 141.) However, the record indicates that Plaintiff did not follow that advice. (*See id.* at 134, 139, 141, 178.) Dr. Wouters indicated that the "#2 [thing is to] see [a] PT for a home exercise program to strengthen his thoracic extensors." (*Id.* at 141.) When asked if, prior to his incarceration, whether Plaintiff exercised to improve his back pain, Plaintiff responded "[n]o, sir." (*Id.* at 44.)

Additionally, again analogous to *Ellison*, but distinguishable from *Dawkins*, the Second ALJ relied on multiple factors aside from Plaintiff's failure to adhere to prescribed medical treatment in denying Plaintiff's Application. (*Id.* at 14-16.) For instance, the Second ALJ correctly pointed out that Dr. Steele had opined that Plaintiff's "functional impairment was moderate," and had advised only "conservative medical management." (*Id.* at 15, 136.) The Second ALJ found Plaintiff's subjective complaints, i.e. rating his pain a "10/10," testifying that he "can't bend over" and has trouble walking, and confirming that

he does not do "any lifting at all," to be inconsistent with that and the other medical opinions. (*See id.* at 14, 41-42, 44, 136, 139.)  Indeed, Dr. Steele noted that Plaintiff used no hand-held assistive device, such as a cane.  (*Id.* at 137.)  Further, Dr. Wouter's June 9, 2003 treatment note indicates that three months prior to Plaintiff's appointment, Plaintiff "was laying some hardwood."  (*Id.* at 140.)   And, as aforementioned, a medical examiner at Ventress Correctional Facility, on May 23, 2006, cleared Plaintiff for kitchen duty.  (*Id.* at 189, 209.)

The Second ALJ also found that the "paucity of medical evidence . . . [concerning] complaints surrounding [Plaintiff's] alleged impairments" was likewise inconsistent with Plaintiff's testimony.  (*Id.* at 16.)  As stated above, no medical evidence exists suggesting that Plaintiff sought treatment for his lower back between August 1, 2003, when Plaintiff last visited Dr. Prevost, and February 28, 2006, when Plaintiff sought treatment from the Southern Rural Health Care Consortium.  (*See id.* at 134-42, 176-80).  As stated by the Second ALJ, "it [is] reasonable to assume that if [Plaintiff] were experiencing difficulties to a disabling degree, he would have presented to his physicians for ongoing treatment."  (*Id.* at 16.)  Furthermore, while intake evaluations and intake screening reports from Kilby and Ventress Correctional Facilities, dated May 10 and 11, 2006, note that Plaintiff had received treatment for his back, (*id.* at 190A-91A), the Kilby and Ventress Correctional Facility records indicate that Plaintiff requested medical treatment only once, (*id.* at 206-08).  That record, dated September 11, 2006, referenced a skin rash, in which Plaintiff complained of

23

redness and itching, not back pain.  (*Id.*)[23]  For these reasons, the court finds that substantial evidence supports the Second ALJ's decision to discredit Plaintiff's subjective testimony, and further is of the opinion that the Second ALJ correctly applied the Eleventh Circuit's pain standard.[24]  As a result, Plaintiff's argument to the contrary is without merit.


**D.     FUNCTIONAL ILLITERACY**

For his third ground, Plaintiff's counsel maintains that "[t]here is no reason to doubt [Plaintiff's] functional illiteracy." (Doc. 10 at 20.)  As support, Plaintiff's counsel notes only that while "there is a paper [that Plaintiff] signed in the record[, that paper] is only proof that [Plaintiff] can sign."  (*Id.*)

To the extent that Plaintiff's counsel suggests that no evidence exists in the record supporting the Second ALJ's finding that Plaintiff "has limited education and is able to communicate in English," (R. at 17), other than a document confirming no more than Plaintiff's ability to sign his name, Plaintiff's counsel is incorrect, (*see id.* at 14-15).

First, on Plaintiff's "Disability Report," dated October 21, 2002, Plaintiff indicated

---

[23] It is also relevant that Mr. Reynolds, the vocational expert, reported that "[t]here are MDIs [i.e. medically determinable impairments] for [Plaintiff's] allegations but the severity is not as stated. Therefore, allegations are partially credible."  (R. at 105.)  The First ALJ similarly "considered [Plaintiff's] own subjective allegations and . . . found them not totally credible in light of the objective medical evidence, as well as the other evidence of record."  (*Id.* at 150.)

[24] As the Commissioner correctly notes, the Second ALJ "cited to 20 C.F.R. §§ 404.1529, 416.929, as well as the Eleventh Circuit pain standard."  (Doc. 14 at 10 (citing R. at 14).)  *See also Wilson*, 284 F.3d at 1225-26 (holding that ALJ correctly applied pain standard and finding relevant that ALJ cited to 20 C.F.R. § 404.1529).

24

that he can read English and is able to write more than his name in English. (*Id.* at 111.) At Plaintiff's initial hearing before the First ALJ, Plaintiff testified that he can read but has trouble spelling. (*Id.* at 74.) At his second hearing before the Second ALJ, Plaintiff likewise testified that he can write, but has difficulty spelling. (*Id.* at 37.) The court finds that substantial evidence supports the Second ALJ's finding that Plaintiff is not "functionally illiterate."[25] Plaintiff's third ground is therefore unpersuasive.


E.     **FULL AND FAIR RECORD**

Lastly, with respect to Plaintiff's final ground for challenging the Commissioner's decision, Plaintiff points out that the December 19, 2007 hearing constituted a *pro se* proceeding, and alleges that the Second ALJ failed to develop a "full and fair record." (Doc. 10 at 17.) Plaintiff's argument also represents the basis for his Motion to Remand or Render & Remand. (*See* Doc. 11.) However, to support the argument, Plaintiff's counsel notes only that Plaintiff's "reading and writing skills are limited," that "[t]he hearing should have not been done behind [his] back," (*id.*), and that the Second ALJ had a "high duty to develop a fair and full record, which also implies a duty to pay attention to that record," (Doc. 10 at 17).

"It is well-established that the ALJ has a basic duty to develop a full and fair record."

---

[25] It is also relevant that, even if the Second ALJ had found Plaintiff to be "[i]lliterate or unable to communicate in English," rather than concluding Plaintiff's education was "[l]imited or less–at least literate and able to communicate in English," the Second ALJ's ultimate decision regarding Plaintiff's Application would not have changed. *Compare* 20 C.F.R. § 404, Subpt. P, App. 2 § 202.16 (directing a decision of "Not disabled"), *with id.* § 202.17 (directing a decision of "Not disabled").

*Ellison*, 355 F.3d at 1276 (citing 20 C.F.R. § 416.912(d)). Furthermore, it is also well-established that "[a] Social Security claimant has a statutory right, which may be waived, to be represented by counsel at a hearing before an ALJ." *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997) (citing *Brown v. Shalala*, 44 F.3d 931, 934 (11th Cir. 1995)). And, "where the right to representation has not been waived, the hearing examiner's obligation to develop a full and fair record rises to a special duty," *id.* at 1422-23 (citing *Brown*, 44 F.3d at 934-35), which consequently requires "the ALJ to 'scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts' and to be 'especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited,'" *id.* at 1423 (quoting *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981)).

To constitute an effective waiver of the statutory right to be represented by counsel, a claimant's waiver must be "knowing and intelligent." *Id.* at 1423 (citing *Brown*, 44 F.3d at 934-35). In *Brown v. Shalala*, the Eleventh Circuit found that a former saleswoman had not "knowingly and voluntarily" waived her right to counsel because, "[a]lthough she eventually responded in the affirmative when asked whether she desired to proceed alone, her earlier statements reflect[ed] that she wanted the assistance of her former supervisor, who told her to go on without him." 44 F.3d at 935. The court noted that "[n]othing in [the saleswoman's] testimony evinces an understanding that she had other options which were either explored or rejected." *Id.* (footnote omitted). On the other hand, in *McCloud v. Barnhart*, the Eleventh Circuit held that a former cashier's waiver constituted an effective,

26

valid waiver.  *See* 166 F. App'x 410, 416 (11th Cir. 2006).  The court pointed out that "[a]t the hearing, [the cashier] gave consistent testimony about her medical condition and activities of daily living," and that "[n]othing about her communication would have indicated that she did not understand the right to counsel or her waiver of that right."  *Id.*

Still, even assuming a claimant's waiver of the right to counsel is ineffective, "there must be a showing of prejudice before it is found that the claimant's right to due process has been violated to such a degree that the case must be remanded to the [Commissioner] for further development of the record."  *Graham*, 129 F.3d at 1423 (citing *Brown*, 44 F.3d at 934-35); *see also Kelley v. Heckler*, 761 F.3d 1538, 1540 (11th Cir. 1985) (holding that claimant failed to show prejudice or unfairness due to lack of counsel in part because claimant failed to even "alleg[e] that the record considered by the ALJ as a whole was incomplete or inadequate")..  In *Graham*, the Eleventh Circuit found that "the record as a whole [was] neither incomplete nor inadequate."  129 F.3d at 1423.  The court noted that the ALJ "brought out all aspects of how [a high school student's] symptoms affected her," including questions with respect to the student's "living arrangements and how she provided for herself and her baby," "her education and school performance," "her medical condition and treatment, her symptoms and frequency, and the medication taken to control them," "how long she could sit and stand, how far she could walk, and how much she could lift."  *Id.* Furthermore, different than the saleswoman in *Brown*, the Eleventh Circuit pointed out that the student "was able to explain to the ALJ how her impairment affected her abilities."  *Id.*

27

Finally, the court stated "[t]he ALJ's opinion thoroughly evaluated [the student's] medical history," "detailed [her] testimony and symptoms, described her functional limitations and daily activities, and then compared these with the functional requirements of light work." *Id.* As a result, the Eleventh Circuit held that the student "ha[d] failed to point to anything in the record which suggests that additional medical evidence specific to her situation might be gathered," and "ha[d] failed to demonstrate evidentiary gaps in the record which . . . resulted in prejudice sufficient to justify a remand to the [Commissioner]." *Id.*

In the instant case, nothing in the record evidences that Plaintiff failed to understand his right to counsel or his waiver of that right. Indeed, the Second ALJ, after informing Plaintiff that he was aware that Plaintiff had retained counsel in the past, asked Plaintiff whether he was ready to proceed. (R. at 34.) Plaintiff answered "[y]es, sir." (*Id.*) To make sure, the Second ALJ again asked, "[a]nybody twist your arm or make you proceed without an attorney?" (*Id.*) Plaintiff responded "[n]o, sir." (*Id.*) Only then did the Second ALJ reply, "I will accept your waiver." (*Id.*) In addition, similar to the cashier in *McCloud*, Plaintiff's testimony regarding his medical condition and daily activities remained consistent throughout the hearing. (*See id.* at 36-46.) And, while the Second ALJ found Plaintiff's testimony to be less than credible, the Second ALJ reasoned that the issue of credibility existed because of inconsistences between Plaintiff's testimony and other record evidence, not due to inconsistencies in the testimony itself. (*Id.* at 15-16.) Finally, it is also relevant that Plaintiff's counsel attended Plaintiff's initial hearing before the First ALJ. (*Id.* at 69.)

Thus, unlike the saleswoman in *Brown*, it is unlikely that Plaintiff failed to understand that he could have representation present during the subsequent hearing before the Second ALJ.

For all that, as the Commissioner argues, "even if the [Second] ALJ had a special or heightened duty to develop the record, Plaintiff cannot show that he was prejudiced by his lack of representation at the administrative hearing." (Doc. 14 at 5-6.)  As in *Kelley*, Plaintiff has not actually alleged how a lack of representation prejudiced or even affected the Second ALJ's decision, nor has Plaintiff claimed that the Second ALJ relied upon an inadequate or incomplete record.  (*See generally* Doc. 10 at 17; Doc. 11.)  Nevertheless, had Plaintiff raised such arguments, it remains, analogous to *Graham*, that the Second ALJ questioned Plaintiff with respect to Plaintiff's education and work history, physical symptoms and functional limitations, medical treatment and medications, as well as regarding Plaintiff's living arrangements and means of support; he specifically asked Plaintiff about his ability to sit, stand, bend, and walk, and inquired as to Plaintiff's lifting capabilities.  (*See* R. at 36-46.)  The Second ALJ explained to Plaintiff the relevant law, and cautioned Plaintiff about the implications of certain responses prior to asking potentially damaging questions.  (*Id.* at 34-36, 45-47.)  Plaintiff's responses demonstrate that he understood the Second ALJ's questions, and was able to describe his back problems and how they affected his previous employment and current activities.  (*Id.* at 41-42, 44.)  The Second ALJ then, in his written decision, detailed and evaluated Plaintiff's responses, compared the responses to Plaintiff's medical records and other evidence, and rendered a candid decision that cited and followed the

29

applicable law. (*Id.* at 10-18.)  Given the Second ALJ's thorough and transparent opinion, and in part because Plaintiff has not raised any specific arguments to the contrary, the court is of the opinion that Plaintiff has failed to demonstrate prejudice due to his lack of representation at the December 19, 2007 hearing, and has further failed to identify a gap in the record, missing medical evidence particular to his impairment, or undiscovered facts that could otherwise justify remanding the case to the Commissioner.  For these reasons, Plaintiff's final ground for challenging the Commissioner's decision is without merit, and Plaintiff's Motion to Remand or Render & Remand is due to be denied.

## CONCLUSION

Applying the standard of review outlined above, and for the foregoing reasons, the court is of the opinion that the Commissioner's decision is due to be affirmed and that Plaintiff's Motion to Remand or Render & Remand is due to be denied.  An Order in conformity with this Memorandum Opinion will be entered contemporaneously.

**DONE** this 31st day of March, 2010.


*Sharon Lovelace Blackburn*
—————————————————————
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE

30